IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Civil Action No. **06-cv-02443-JLK-MEH**

**PAUL G. WARNER and
JILL R. WARNER**,

       Plaintiffs,

v.

**FORD MOTOR COMPANY, a foreign corporation,**

       Defendant.

_____

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' THIRD CLAIM FOR RELIEF**
_____

Kane, J.

      This action arises from a motor vehicle accident in which a 1995 Ford Explorer driven by

Plaintiff Paul G. Warner rolled on to its roof.  Mr. Warner was severely injured in the accident.

Mr. Warner and his wife, Jill R. Warner, allege these injuries were caused by design and

manufacturing defects in the vehicle.  They further allege that Defendant Ford Motor Company

("Ford") engaged in unfair and deceptive trade practices by falsely representing to the public that

the 1995 Ford Explorer was safe and met its standards for quality and by failing to disclose

information regarding known safety defects.  Based on these allegations, the Warners have

asserted claims against Ford for negligence, products liability and violation of the Colorado

Consumer Protection Act.

      This matter is before me on Ford's motion for summary judgment on the Warners' claim

under the Colorado Consumer Protection Act ("CCPA").  Determination of this motion turns on

three difficult issues:  (1) whether the Warners' evidence that Ford failed to disclose information

regarding the safety of its vehicle creates a genuine issue of material fact under the Warners'

novel theory of a deceptive trade practice under the CCPA; (2) whether the Warners produced sufficient evidence of the alleged practice's public impact, as required to prevail on a CCPA claim; and (3) whether the Warners presented sufficient evidence of causation to support their CCPA claim. The first issue in particular raises questions concerning the scope of the CCPA that have not been addressed by the Colorado courts. After carefully considering the parties' extensive briefing on this and the other issues presented by Ford's motion, I deny summary judgment on the Warners' CCPA claim.

Factual Background

Before addressing the facts relevant to the motion, I must first dispose of a preliminary issue. Ford's Motion for Partial Summary Judgment included a Statement of Undisputed Material Facts as required by our local rules of practice. In their Response to Ford's motion, the Warners did not admit or deny each of the undisputed facts asserted by Ford, as required by my pretrial procedures, *see* Memorandum to Counsel from Senior Judge John L. Kane re: Pretrial and Trial Procedures, § III, but instead provided their own Statement of Undisputed Material Facts. *See* Pls.' Resp. (Doc. #51) at 3-13. Based on this non-compliance with my pretrial procedures, Ford urges the court either to strike the Warners' Response or to consider each of Ford's asserted facts admitted.

Most of Ford's facts can be admitted without disturbing the Warners' theory of liability under the CCPA. A few of those facts, if admitted, however, would require a finding for Ford on the CCPA claim as a matter of law. It is nonetheless clear from the Warners' own Statement of Undisputed Material Facts that they contest these potentially dispositive facts, and their response and supporting evidence establishes genuine issues regarding these material facts, as discussed below. In particular, while Ford asserts it had no knowledge that its vehicle was unsafe, the

Warners provide pages of exhibits creating a genuine issue of fact as to whether Ford engineers knew Ford vehicle roofs were too weak to protect occupants during rollovers. The material facts that the Warners admit and deny are therefore clear from their response. Under these circumstances, it is not necessary to strike the Warners' response or to treat all of Ford's facts as admitted. Such a Draconian measure would sacrifice substance and place a premium on process.

With that prelude, the following facts are undisputed unless otherwise stated:

A.      Vehicle Purchase

Paul Warner purchased a 1995 two-door Ford Explorer on February 12, 2002 from McDonald Automotive. McDonald Automotive is a used car dealership unaffiliated with Ford, and Mr. Warner did not communicate with any of Ford's employees or agents during his search for a new car or concerning his purchase of the Explorer. The only entities involved in Mr. Warner's purchase were McDonald Automotive, its salesperson, and Mr. Warner. Warner was not seeking any particular safety features, but he was interested in buying a vehicle that had "some substance," and was generally safe.

Ford no longer advertised the 1995 Explorer when Mr. Warner purchased his vehicle. Mr. Warner was generally aware, however, of Ford's advertising, and remembers seeing television and print advertisements promoting Ford vehicles and the Explorer using the slogans "Quality is Job 1," and "Ford Tough." He does not remember any specific ads beyond these slogans. Mr. Warner also read statements in the Explorer's Owner's Manual stating that at Ford "quality comes first," and "integrity is never compromised," among other statements touting the quality of Ford vehicles generally. Mr. Warner is unable to remember whether he read the Owner's Manual before purchasing the Explorer or soon after.

B.    The Accident

On February 19, 2005, Mr. Warner was driving the Explorer westbound on Interstate 70. He lost control of the vehicle and it slid off the highway into the median area, rolling on to its roof.  The Explorer's roof crushed inward over Mr. Warner's head.  He was wearing his seatbelt at the time of the accident, which kept him upright and under the collapsing roof during the rollover.  The crushed roof caused Mr. Warner's neck to compress toward his chest, damaging his spinal cord and rendering him a quadriplegic.  The Warners' expert opines there are "various alternative designs that strengthen the roof and preserve the occupant space" that were not employed in the 1995 Ford Explorer, and that "there is a reasonable scientific and forensic probability that Mr. Warner's catastrophic neck injury would not have of occurred" had such an alternative design been employed.  Pls.' Resp. (Doc. #51), Ex. 32 (Report of Paul Lewis) at 38.

C.    Vehicle Safety and Design

Although the parties largely agree on the facts related to Mr. Warner's purchase of the Explorer and his accident, they dispute facts pertaining to what Ford knew about its vehicles' safety.  As described more fully below, Ford contends it has always believed its vehicles to be safe, and that in particular Ford always believed the 1995 Explorer was not unreasonably susceptible to rollover, protected its occupants well when it did, and had seatbelt systems that were adequately designed.  The Warners counter that "Ford has knowingly, consistently and systematically misled and withheld information from the federal government and the public regarding safe roof design and dangers of its vehicles' weak roof structures."  Pls.' Resp. (Doc. #51) at 2.  In support of this statement they present evidence showing that Ford engineers knew its vehicles' roof systems were defective and that the roof of the 1995 Explorer in particular was too weak to protect occupants in rollovers.  They also present evidence that Ford

4

engineers knew that the best way to protect front seat occupants was to strengthen a particular part of the roof system called the A-pillar, but that Ford instead chose to strengthen other system components out of a concern for cost.

1.    Ford and roof strength standards

Ford presents evidence that the 1995 Explorer complied with all federal standards and, that rather than having a high susceptibility to rollover, it had "a high resistance to rollover." Ford Explorer marketing executive Douglas Scott also testified by affidavit that "Ford did not fail to disclose any information about the 1995 Ford Explorer's handling and stability, seatbelt system, roof and supporting structures or otherwise with the intent of inducing the sale of [the Explorer]" to the Warners.  Def.'s Mot. for Partial Summ. J. (Doc. #47), Ex. A-3 (Scott Aff.), ¶ 10.

The Warners present a different story, starting with roof testing research at Ford in the 1960's.  In 1968 a Ford engineer reporting on a roof strength study concluded that "[a] significant number of accidents result in roof damage," that "[p]eople _are_ injured by roof collapse," and although "[t]he total number of nationwide deaths and injuries cannot be estimated . . . it is a significant number."  Pls.' Resp. (Doc. #51), Ex. 6 at 2 (emphasis in original).  Ford's internal report also stated that "occupants that are restrained in upright positions," that is occupants wearing seatbelts, "are more susceptible to injury from a collapsing roof than unrestrained occupants who are free to tumble about the interior of the vehicle."  _Id._ Because in rollover accidents the vehicle often comes to rest on its roof, "the roof structure must support the weight of the vehicle" and the "load factor" on the roof is "conservatively, two or twice the weight of the vehicle."  _Id._ at 3.  The study author therefore recommended that passenger car roofs be strong enough to withstand two times the weight of the vehicle.  _Id._  This

recommendation was echoed in a February 1969 intra-company memo from Ford's Executive Engineer of Safety Engineering. *See* Pls.' Resp. (Doc. #51), Ex. 7 at 3 ("roof of a vehicle should be strong enough to sustain twice the curb weight of the vehicle ").

Despite these recommendations, in February 1970, a memorandum from Ford's Car Body System Engineering reports that Ford adopted a corporate objective of only 1.5 times the curb weight for the roof strength of all vehicles, 25% less than recommended. *Id.*, Ex. 8. The National Highway and Transportation Safety Administration ("NHTSA") then proposed the same standard as a federal requirement for all passenger cars. *Id.*, Ex. 10 (Proposed Standard for Roof Intrusion Protection for Passenger Cars, 36 Fed. Reg. 166 (Jan. 6, 1971)). Ford's Safety and Emissions Program concluded that current Ford vehicles would not meet this standard. *Id.*, Ex. 11 at 2.

Ford's North American Automotive Operations Working Safety Committee met after the proposed federal roof strength standard was announced. The minutes from that meeting describe Ford's opposition to the proposed standard, stating, "[w]e hope to be able to convince the NHTSA that the proposal, as written, is not a significant safety plus." *Id.*, Ex. 12 at 2. The Safety Committee also intended to tell the NHTSA that "[t]he data indicates that there is no causal relationship between roof intrusion in a roll-over accident and fatal injury." *Id.*, Ex. 12 at 2.

A subsequent memorandum from the NHTSA indicates Ford advised the agency of these views, stating "Ford's position is that available evidence does not indicate that existing roof structures contribute significantly to occupant injury through collapse in rollovers." *Id.*, Ex. 26. Nonetheless, the NHTSA adopted the proposed rule and in September 1973 imposed the 1.5

times vehicle weight standard for passenger car roofs as Federal Motor Vehicle Safety Standard ("FMVSS") 216. *Id.*, Ex. 13 (DaDeppo Dep.), at 103.

When Ford began to design light trucks and SUVs in the late 1980's it was not bound by any federal roof strength standards. A preliminary version of Ford's Light Truck Safety Guideline Strategy stated that "Light Truck rollovers are 2 to 4 times the car rate," and that "[h]istorical roof crush experience in Light Truck rollover accidents suggests that a new guideline which exceeds the current car standards may be appropriate." Pls.' Resp. (Doc. #51), Ex. 14 at 16. A later version of this document stated further that "[u]tility vehicles exhibit relatively higher rollover frequency and, given a rollover, the injury consequences can be more severe." *Id.*, Ex. 15 at 6. Ford also reasoned that rollovers were inevitable in many accidents, and that although "increased seat belt usage is expected to reduce occupant ejections, it also means there will be an increase in the number of occupants retained in the vehicle during a rollover," making "the focus shift[] to the roof structure to minimize the risk of restrained occupant injury." *Id.* at 13. Ford therefore proposed "establishing a guideline that exhibits criteria proportionately better than the [FMVSS] 216 requirement" for passenger cars of 1.5 times vehicle weight. *Id.*

Despite this internal company analysis, before the NHTSA Ford advocated that the FMVSS 216 Roof Crush Resistance Standard be extended without change to light trucks. Pls.' Resp. (Doc. #51), Ex. 17. In 1991 NHTSA extended the passenger car standard of 1.5 times the weight of the vehicle to light trucks. *Id.*, Ex. 16 (NHTSA Final Rule, 56 Fed. Reg. 155510 (Apr. 17, 1991)).

Ford's subsequent internal Roof Crush Safety Guideline Proposal noted that "[a] 25% increase in load capacity over the FMVSS 216 requirements is necessary to have statistical

confidence that all vehicles will comply." Pls.' Resp. (Doc. #51), Ex. 27. Accordingly, Ford internally adopted a standard of 1.875 times vehicle weight as its standard for roof crush protection. *Id.*, Ex. 18.

The Warners' forensic engineering expert, Stephen M. Forrest, states in his affidavit that car manufacturers use safety margins to ensure compliance with Federal standards because of the significant variation in vehicles built at different times and at different locations: "If a certification test is run and it produces a roof strength of 1.5 times the vehicle weight (the minimum requirement) and this test is representative of the average vehicle, then it could be assumed that half the vehicles might pass and half the vehicles might fail." Pls.' Resp. (Doc. #51), Ex. 19 (Forrest Aff.), ¶ 20.

After Ford determined that a 25% margin was necessary to ensure that all similar vehicles would pass the FMVSS 216 standard of 1.5 times the vehicle weight, the Ford Explorer for the 1993 model year failed to pass this internal standard. Ford then lowered its internal safety margin to 15%, and then 9%. Mr. Forrest reports "[e]ach of the subsequent two generations of 4-door Ford Explorers have been weaker than the original. The UN46 (from 1990-1994) had a roof strength of 1.72. The UN105 (from 1994-1996) had a roof strength of 1.68. The UN150 (from 1996-2002) had a roof strength of 1.52." *Id.*, Ex. 19 (Forrest Aff.), ¶ 19.

Ford disputes the Warners' characterizations of Ford's roof strength research and standards, and argues that it has always had a good faith belief in the safety of its vehicles' roof design. As evidence of this good faith belief, Ford points to an email from an employee at its Volkswagen subsidiary, in which the employee states that "[Ford] does not currently believe in roof crush as the major contributor to head/neck injuries in rollovers." Pls.' Resp. (Doc. #51),

Ex. 25.  Ford also argues that it has always made its position publicly known through its submissions to the NHTSA.

### 2.    Ford's design decisions regarding the A-pillar

The A-pillar is located at the left front of vehicles, nearest to the front seat occupant. The Warners have produced evidence that Ford recognized in 1969 that "increasing the 'A' pillar moment of inertia at the belt line is the most effective way of reducing roof crush."  Pls.' Supp. Resp. (Doc. #58), Ex. 4 (Ford Intra-Company Mem. from H.G. Brilmyer (May 20, 1969)) at 1. Ford engineer Christopher Brewer acknowledged this research in his deposition, stating that "Ford research showed that the A pillar is the most important part of the roof structure for protecting people in rollovers."  *Id.*, Ex. 1 (Brewer Dep.) at 74.  He also testified, however, that the B-pillar, located between the driver's door and the back seat, is "almost equally important." *Id.*, Ex. 1 at 74.[1]

According to documents reviewed by Mr. Brewer at his deposition, when the federal government initially proposed a standard for roof strength in 1971, its proposed test for compliance was to push a twelve-inch square metal plate directly down on the A-pillar.  *Id.*, Ex. 1 at 75.  Ford determined that the A-pillars for its 1971 and 1972 vehicles would have had to be strengthened by 250% to pass this test.  *Id.*, Ex. 1 at 75-77.  Ford met with the NHTSA to discuss the proposed roof strength standard and advocated an alternative test using a larger test block so that force would be applied to the B and C-pillars as well as the A-pillar.  Pls.' Resp.

---

[1]    Ford objects to consideration of the Brilmyer memorandum or Mr. Brewer's testimony concerning the A-pillar on authentication and other grounds.  As discussed below, the facts supported by this evidence are not necessary to reach a decision on Ford's motion challenging the Warners' CCPA claim.  Accordingly, I do not decide Ford's objections here and do not rely on the disputed evidence in rendering my decision.  Ford's evidentiary challenges will be decided, if necessary, before trial.

(Doc. #51), Ex. 26.  Ford did not disclose to federal regulators that the A-pillars in its current vehicles would need to be 250% stronger to meet the originally proposed test, a change that would be costly.  Pls.' Supp. Resp. (Doc. #58), Ex. 1 (Brewer Dep.) at 80.  After this meeting, the NHTSA changed the test per Ford's recommendations.  *Id.*

Mr. Brewer also testified that by the early 1990's, as Ford began to design the Explorer series, it was common knowledge among Ford engineers that the most cost-efficient way to pass the federal FMVSS 216 roof strength test was to strengthen the B-pillar, not the A-pillar.  *Id.*, Ex. 1 (Brewer Dep.) at 82.  When designing the original two-door Explorer, Ford's roof testing indicated that the prototype's roof structure needed to be stronger.  *Id.*, Ex. 1 at 47.  Instead of bolstering the A-pillar, Ford considered two different approaches to strengthening the B-pillar.  *Id.*, Ex. 1 at 47-48.  Paul Warner's 1995 Explorer's A-pillar buckled in two places, whereas his B-pillar remained relatively intact.  *Id.*, Ex. 1 at 27.

The Warners characterize Ford's 1971 meeting with federal regulators as Ford "fixing" the federal compliance test to save the company the cost of strengthening the A-pillar in its vehicles.  Pls.' Supp. Resp. (Doc. #58) at 6.  Ford disputes this characterization, asserting there was no federal standard in April 1971 when Ford met with the NHTSA, and therefore no federal test for compliance that Ford could "fix" to make it easier or less costly to pass.  Def.'s Supp. Reply (Doc. #59) at 7.  Further Ford argues that even if the Warners are able to prove at trial that Ford influenced the federal test for compliance with FMVSS 216 in this way, this would only pertain to the design and testing of Ford's passenger vehicles, and has nothing to do with the 1995 Ford Explorer driven by Paul Warner.  *Id.*

Standard of Review

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In applying this standard, I view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party. *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999).

The party seeking summary judgment bears the initial burden of identifying the portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, which it believes demonstrate the absence of genuine issues for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets this burden, the burden shifts to the nonmoving party to show there are genuine issues of material fact to be determined. *Id.* at 322. When, as in this case, the nonmoving party will bear the burden of proof at trial, that party may not rest upon the allegations made in the complaint, but must respond with specific facts showing the existence of a genuine and material factual issue to be tried. *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998). A genuine issue of material fact exists if a rational juror could decide the disputed allegations in the non-movant's favor based on the evidence presented, and the disputed fact might affect the outcome of the suit under the governing law. *See Schwarz v. Bhd. of Maint. of Way Employees*, 264 F.3d 1181, 1183 (10th Cir. 2001).

Discussion

In their Third Claim for Relief, the Warners allege Ford engaged in unfair and deceptive trade practices in violation of the CCPA, Colo. Rev. Stat. § 6-1-101 *et seq.* (2007), by:

11

(1) representing that the 1995 Ford Explorer was safe and met a particular standard and quality when in fact it did not, First Am. Complaint (Doc. #15), ¶ 34, and (2) by failing to disclose material information concerning the dangerous propensities and defects of the 1995 Explorer, which were known to it at the time of the Explorer's advertisement and sale, *id.*, ¶ 36.

The Colorado Consumer Protection Act was enacted in 1969 as Colorado's version of the Uniform Deceptive Trade Practices Act. *People ex rel. Dunbar v. Gym of Am., Inc.*, 493 P.2d 660, 664-65 (1972). The CCPA was intended to provide "prompt, economical and readily available remedies against consumer fraud." *W. Food Plan v. Dist. Court*, 598 P.2d 1038, 1041 (Colo. 1979). It provides injunctive relief, treble damages and attorney fees to individuals wronged by deceptive trade practices that significantly impact the public. Colo. Rev. Stat. §§ 6-1-105, 6-1-110, 6-1-1134.

The Colorado Supreme Court has taken "an expansive approach" in interpreting the CCPA. *May Dep't Stores Co. v. State ex rel. Woodard*, 863 P.2d 967, 973 n.10 (Colo. 1993). The court has stated that because of the "the strong and sweeping remedial purposes of the CCPA," when "determining whether conduct falls within the purview of the CCPA, it should ordinarily be assumed that the CCPA applies to the conduct." *Crowe v. Tull*, 126 P.3d 196, 202 (Colo. 2006) (quoting *Showpiece Homes v. Assurance Co. of Am.*, 38 P.3d 47, 53 (Colo. 2001)).

To prove a private cause of action under the CCPA, a plaintiff must show: "(1) that the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation; (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) that the plaintiff suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury." *Rhino Linings United States v. Rocky Mt.*

*Rhino Lining*, 62 P.3d 142, 146-147 (Colo. 2003) (citing *Hall v. Walter*, 969 P.2d 224, 235

(Colo. 1998)).  The first three elements focus on the alleged actions of the defendants,

"comport[ing] with the General Assembly's purpose in enacting the CCPA of preventing

deceptive trade practices that 'may prove injurious, offensive or dangerous to the public,'" while

the fourth and fifth elements "address whether the impact of these actions is such that a

particular plaintiff in question has a cause of action under the statute."  *Hall*, 969 P.2d at 236

(quoting *People ex rel. Dunbar v Gym of Am., Inc.*, 493 P.2d 660, 667 (Colo. 1972)).

Ford argues that a reasonable jury could not find for the Warners on their CCPA claim

because they do not have sufficient evidence to meet their burden of proof on the first, third and

fifth elements of a private claim under the CCPA.  As to the second and fourth elements, Ford

admits that the challenged practice occurred in the course of Ford's business, vocation or

occupation and that the Warners suffered an injury in fact to a legally protected interest.

A.      First Element:  Whether Ford Engaged in an Unfair or Deceptive Trade Practice

The Warners allege Ford engaged in unfair and deceptive trade practices both by

misrepresenting the safety and quality of the 1995 Ford Explorer and by failing to disclose

material information concerning the vehicle's safety characteristics.  Ford contends both of these

asserted bases are insufficient to support a CCPA claim as a matter of law.

1.      Alleged misrepresentations

Under the CCPA, a deceptive trade practice includes a representation by a person "that

goods, food, services, or property are of a particular standard, quality, or grade . . . if he knows

or should know that they are of another."  Colo. Rev. Stat. § 6-1-105(1)(g).  A knowingly "false

representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of

goods" also constitutes a deceptive trade practice under the statute.  *Id.* § 6-1-105(1)(e).  The

Colorado Supreme Court has further defined an actionable misrepresentation under the CCPA as a "false statement of fact that either induces the recipient to act or has the capacity to deceive the recipient" that "is made 'either with knowledge of its untruth, or recklessly and willfully made without regard to its consequences, and with an intent to mislead and deceive the plaintiff.'" *Rhino Linings*, 62 P.3d at 144, 147 (quoting *Parks v. Bucy*, 72 Colo. 414, 418 (1922)).

The Warners base the misrepresentation component of their CCPA claim principally on two Ford advertising slogans – "Quality is Job 1" and "Built Ford Tough," – and statements in the 1995 Ford Explorer Owner's Manual proclaiming the general quality of Ford products. These slogans and statements, however, are not actionable under the CCPA and Colorado case law interpreting it.

In *Park Rise Homeowners Association v. Resource Construction Co.*, 155 P.3d 427 (Colo. Ct. App. 2006), *cert. denied*, No. 06SC485, 2007 WL 93091 (Jan. 16, 2007), the Colorado Court of Appeals considered whether a developer's promise of "quality construction" was actionable as a misrepresentation under the CCPA. The *Park Rise* plaintiffs argued this statement was a knowing misrepresentation by the developer because it knew there were problems with wet crawl spaces in one of their buildings. *Id.* at 435. The developer, in turn, argued its "quality construction" statement was "mere puffing," that is a "statement[] of opinion" rather than fact, that was non-actionable under the CCPA as a result of the common law doctrine allowing sellers "'the right to exalt the value or quality of their own property to the highest point credulity will bear'" so long as the sellers' "'statements of value or quality'" were not "'made with the purpose of having them accepted as of fact.'" *Id.* (quoting *Groves v. Chase*, 151 P. 913, 915 (Colo. 1915)).

The Colorado court agreed the CCPA, as a matter of law, did not make actionable a statement that qualified as mere puffery under the common law doctrine. *Id.* It further found that the representation of "quality construction," was puffery, and hence non-actionable under the CCPA, because the statement was "extremely general" and not "a specific representation of fact subject to measure." *Id.* at 435-436.

Like the assertion of "quality construction" in *Park Rise*, Ford's slogans and statements regarding the quality and "toughness" of its vehicles amount to mere puffery as a matter of law. They are exaggerated opinion, rather than representations of fact, because they are extremely general, not directed at any specific attribute of Ford vehicles and are not representations of fact subject to measure. Under *Park Hill*, such statements or "puffing" do not constitute a deceptive trade practice under the CCPA. *See Park Rise*, 155 P.3d at 436; *see also Rhino Linings*, 62 P.3d at 144 (requiring misrepresentations to be false statements of fact).

The Warners also allege that Ford's made misrepresentations that qualify as deceptive trade practices under the CCPA: (1) when Ford advised the NHTSA in the early 1970's that "available evidence does not indicate that existing roof structures contribute significantly to occupant injury through collapse in rollovers," despite internal Ford testing indicating the opposite, and (2) when it advocated before the agency for lower federal roof strength standards that its internal research suggested was necessary. While these statements to the NHTSA may be false statements of fact, they are not actionable under either sections 6-1-105(1)(e) or 6-1-105(1)(g) of the CCPA because they are representations about Ford's safety research and not representations about Ford products. *See* Colo. Rev. Stat. § 6-1-105(1)(e)(prohibiting false representations as to the "characteristics, ingredients, benefits, alterations or qualities of goods");

15

§ 6-1-105(1)(g)(prohibiting representing that "goods…are of a particular standard, quality or grade").

Accordingly, the Warners have not, as a matter of law, alleged misrepresentations that constitute deceptive trade practices actionable under the CCPA.

>                     2.        Ford's alleged failure to disclose material information

Under the CCPA, a "fail[ure] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale" is a deceptive trade practice "if such failure to disclose such information was intended to induce the consumer to enter into a transaction."  Colo. Rev. Stat. § 6-1-105(1)(u).  The Warners allege Ford engaged in this form of deceptive trade practice by knowingly failing to disclose the Explorer's high susceptibility to rollover, its weak roof structure, and the inadequacies of its seat belt system in restraining its occupants.  The Warners allege these facts are material because reasonable persons consider a vehicle's safety characteristics in deciding what vehicle to purchase, and that Ford failed to disclose these material facts at the time it advertised and sold the 1995 Explorer because it knew doing so would deter potential purchasers of the vehicle.

Few cases address the scope of section 6-1-105(1)(u) and the circumstances under which the failure to disclose material facts is a deceptive trade practice under the CCPA.  *See* Daniela Ronchetti, *Comment and Casenote, Opening the Door:  Crowe v. Tull and the Application of the Colorado Consumer Protection Act to Attorneys*, 79 U. Colo. L. Rev. 295, 309 (2008).  While the Colorado courts have cited section 6-1-105(1)(u) in a number of cases, in none of them did

the courts discuss what elements a plaintiff must prove to succeed on a material omission claim under the CCPA or apply section 6-1-105(1)(u) to facts.[2]

Although there are no Colorado cases on point, the Supreme Court of Illinois applied a similar provision of the Illinois Consumer Fraud Act ("ICFA"), 815 Ill. Comp. Stat. 505/1 *et seq.* (West 1994), to facts analogous to those here. *See Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 595 (Ill. 1996). The ICFA requires a showing of a deceptive act or practice, which it defines to include "the concealment, suppression or omission of any material fact." 815 Ill. Comp. Stat. 505/2. The plaintiffs in *Connick* alleged Suzuki sold Suzuki Samurais knowing the vehicle had safety problems, including a high susceptibility to rollover and inadequate occupant protection, but that Suzuki did not disclose these facts to the public. The *Connick* plaintiffs alleged these safety issues were material because they would not have purchased the vehicles if Suzuki had disclosed the Samurai's safety risk. The court held these allegations sufficient to state a claim for consumer fraud under the ICFA. *Connick*, 675 N.E.2d at 595.

---

[2]    *See May Dep't Stores Co. v. State ex rel. Woodard*, 863 P.2d 967, 971-72 (Colo. 1993) (noting that trial court found a failure to disclose in violation of section 6-1-105(1)(u) in conjunction with other deceptive trade practices, but focusing on CCPA's remedies); *Hoang v. Arbess*, 80 P.3d 863, 870 (Colo. Ct. App. 2003) (reversing directed verdict on plaintiff's CCPA claims, including material omission claim under section 6-1-105(1)(u), but only discussing trial court's improper belief that corporate officers cannot be held individually liable under CCPA); *Park Rise*, 155 P.3d at 436-37 (dismissing plaintiff's claim under section 6-1-105(1)(u) for lack of public impact without considering whether alleged failure to disclose constituted a deceptive trade practice) (Colo. 2007); *Mangone v. U-Haul Int'l, Inc.*, 7 P.3d 189 (Colo. Ct. App. 1999) (not addressing substance of plaintiff's claim under section 6-1-105(1)(u)); *Farmer's Alliance Mutual Ins. Co. v. Cutrone*, 448 F. Supp. 2d 1226 (D. Colo. 2006) (granting summary judgment on defendant's counterclaim for violation of section 6-1-105(u) for lack of evidence without discussing evidence/facts presented by defendant).

In addition to the lack of Colorado precedent addressing the reach of section 6-1-105(1)(u), there is no legislative history for the CCPA. *Crowe*, 126 P.3d at 201-202. The Colorado Supreme Court, however, has traditionally "construe[d] the CCPA to give its terms their plain and obvious meaning." *Crowe*, 126 P.3d at 201 (citing *Hall*, 969 P.2d at 229). The plain language of section 6-1-105(1)(u) suggests that a plaintiff must prove the following four facts in order for a failure to disclose to be a deceptive trade practice actionable under the CCPA: (1) that the defendant failed to disclose information concerning goods, services or property to consumers; (2) that the defendant knew this information at the time of the advertisement or sale of the goods, services or property; (3) that the non-disclosed information was material; and (4) that the defendant did not disclose this information with the intent to induce the consumer to enter into a transaction. *See* Colo. Rev. Stat. § 6-1-105(1)(u).

The Warners present a novel theory under Colorado law, namely that Ford marketed a product knowing it had a safety defect that it failed to disclose. Whether this theory states a deceptive trade practice under section 6-1-105(1)(u) requires an evaluation of each of the statutory elements stated above. As relevant to that evaluation, the Warners allege: (1) Ford failed to disclose to the public information about safety problems relating to rollovers and roof protection that it knew the 1995 Ford Explorer had; (2) Ford knew this information at the time of its initial design and testing of the 1995 Explorer and therefore knew it at the time the 1995 Explorer was advertised and later sold to Mr. Warner; (3) this information was material because reasonable consumers, including Mr. Warner, attach importance to a vehicle's safety characteristics; and (4) Ford withheld this information to induce potential consumers to buy its products.

Whether these allegations state a deceptive trade practice under CCPA

section 6-1-105(1)(u) turns initially on the meaning of the final requirement of this section, that

the omission "was intended to induce *the consumer* to enter into a transaction." Colo. Rev. Stat.

§ 6-1-105(1)(u) (emphasis added). Ford argues this statutory requirement must be read narrowly

to require that the Warners show Ford intended to induce Mr. Warner specifically to buy the

used Explorer. This narrow reading, however, belies the Colorado Supreme Court's precedent of

construing the language of the CCPA broadly. *See Crowe*, 126 P.3d at 202. A broader reading

of section 6-1-105(1)(u) allows for any failure to disclose that is intended to induce consumers to

enter into transactions to be actionable as a deceptive trade practice under the CCPA. This

reading, which I adopt, encompasses the omission alleged by the Warners.

Ford's alleged failure to disclose the safety issues with the 1995 Explorer parallels

Suzuki's alleged failure to disclose in *Connick*. *See* 675 N.E.2d at 505. The Warner's

allegations are nearly identical to those of the *Connick* plaintiffs, *i.e.*, that Ford, like Suzuki,

knowingly failed to tell the public that its vehicle was defective, and that the defect was material

because consumers would not have purchased the vehicle had they known about it. This

omission was found actionable by the Illinois Supreme Court, and would likely be found

actionable by the Colorado Supreme Court in light of its precedent that when deciding whether

disputed conduct is a deceptive trade practice under the CCPA, it should normally be assumed

that it is so as to serve "the strong and sweeping remedial purposes of the CCPA." *Crowe*,

126 P.3d at 202; *Showpiece Homes*, 38 P.3d at 53.

Accepting this broad reading of section 6-1-105(1)(u), the Warners have established

sufficient issues of fact to survive summary judgment on the deceptive trade practices element of

their CCPA claim. First, the Warners allege in their amended complaint that Ford withheld

information about three related safety issues – the Explorer's high susceptibility to rollover, its inadequate roof protection, and inadequacies in its seatbelt system – and have produced evidence that Ford knew the Explorer's roof and supporting structure were inadequate to protect seat-belt wearing occupants during a rollover yet failed to disclose this information. In particular, the Warners presented evidence that Ford knew its roofs were not strong enough to protect occupants but did not disclose this to the public. This evidence includes the results of Ford's internal testing indicating that roof collapse was a serious danger to occupants in rollovers, and that passenger cars should have roofs "conservatively" two times the vehicle's weight. Despite this information, Ford adopted a lower roof protection standard for passenger cars, and this standard was later extended to light trucks and SUVs disregarding further internal research indicating these larger cars might require roofs stronger than passenger cars to protect occupants. Further, the Warners have presented evidence that Ford progressively lowered the statistical margin it set for its vehicles to comply with federal roof protection standards, and also that the 1995 four-door Ford Explorer had a roof strength below the original recommendation for passenger cars issued in 1969.

Ford marketing executive Douglas Scott asserts in his declaration that Ford "did not fail to disclose any information about the 1995 Ford Explorer's…roof and supporting structures." Def.'s Mot. for Partial Summ. J. (Doc. #47), Ex. A-3, ¶ 10. Nonetheless, a reasonable jury could infer from the Warners' evidence that Ford knew its roofs were not strong enough to protect adequately occupants from roof collapse during a rollover, and in particular that Ford knew the 1995 Ford Explorer's roof was not strong enough, and yet Ford kept this knowledge from the public. This is sufficient to create a genuine issue of fact on Ford's failure to disclose. *See Anderson*, 477 U.S. at 250.

While the Warners have produced sufficient evidence to create a triable issue of fact regarding its lack of disclosure about the risk of "roof crush" in the Explorer, they have not pointed to evidence in the current record that Ford knew yet failed to disclose that the Explorer was unreasonably susceptible to rollover or that design and manufacturing inadequacies affected the seat belts system's ability to restrain occupants. To the extent the Warners intended to state a material omissions claim with respect to these specific alleged defects, *see* First Am. Complaint, ¶ 36, the Warners have failed to demonstrate a genuine issue of fact on them, with the result that they will not be permitted to assert a material omission claim at trial based solely on these specific alleged defects.

In addition to providing evidence of Ford's knowing failure to disclose information regarding inadequate roof protection, the Warners also produced evidence that Ford was aware of this safety issue when it advertised the 1995 Explorer and when the Explorer was sold to Mr. Warner in 2002. Ford advertised the 1995 Explorer from October of 1994 through July of 1995. The Warners produced evidence that Ford performed roof strength testing before distributing new vehicles to ensure their compliance with Federal standards. In light of this evidence and evidence that Ford engineers recommended a stronger roof for passenger cars as early as 1969 and in 1987 reported that SUVs would likely require stronger roofs than passenger cars, a reasonable jury could infer that Ford knew in 1995, before Mr. Warner purchased the Explorer, that the 1995 Explorer's roof strength was inadequate.

The Warners also establish a genuine issue of fact as to whether the weakness of the 1995 Explorer's roof was material to consumers. Ford urges that "material" as used in section 6-1-105(1)(u) be read narrowly to require the Warners to prove the safety issue was material to Mr. Warner specifically. The Warners respond by arguing that it is sufficient that

this information is material to consumers generally. Drawing all reasonable inferences in their favor, the Warners have established a genuine issue of fact under either standard. As to Mr. Warner, although he did not seek out a car with any particular safety features, he did state he was looking to buy a car that was generally safe. A reasonable jury could therefore find that he would not have bought the Explorer had he known it had a major safety concern. As to general consumers, the Warners presented evidence that SUVs are susceptible to rollover and that roof crush causes serious injury. A reasonable jury could infer from this evidence that roof strength is a serious safety issue and that information about the ability of a vehicle's roof system to protect occupants from roof crush would therefore be material to consumers in deciding whether to purchase a vehicle.

Whether the Warners have presented sufficient evidence indicating that Ford's omission "was intended to induce the consumer to enter into a transaction" turns on the broadness of the court's reading of this statutory requirement, as discussed above. Although none of the Warners' evidence speaks to the issue directly, under a broad reading of the statute a reasonable jury could infer that a company that withholds information about the safety of its product is doing so to sell more product. Under this broad reading, adopted above, the Warners have established a genuine issue of fact on this element of an actionable omission under section 6-1-105(1)(u).

Ford argues that the Warners nonetheless cannot sustain a claim under section 6-1-105(1)(u) because the Warners have no evidence that Ford communicated with Mr. Warner. This argument is based on this court's decision in *Baca v. Clark*, No. 06-cv-00714-EWN, 2007 WL 2022054 (D. Colo. July 9, 2007).

In *Baca*, the court considered the plaintiff's claim that the defendant manufacturer committed a deceptive trade practice under section 6-1-105(1)(u) by inducing the plaintiff to

purchase defective scaffolding via photographs on the seller's website that were identical to photographs on the defendant manufacturer's website. *Id.* at *6. The plaintiff decided to purchase the scaffolding as a result of viewing the seller's website, but she had not received any communication from the manufacturer "either directly or through advertisements." *Id.* The court held the defendant could not be liable under the CCPA for failure to disclose absent any communication between the plaintiff and the defendant, and granted summary judgment on this basis against the plaintiff's CCPA claim. *Id.* at *7.

*Baca* is distinguishable from the present case because Ford did communicate with Mr. Warner. While the slogans identified by Mr. Warner are not actionable on their own, they indicate that Ford advertised to Mr. Warner. Mr. Warner also read the 1995 Explorer Owner's Manual, a document produced by Ford, either before purchasing the vehicle or soon after.

Accordingly, for the reasons stated above, I find there are genuine issues of fact on the question of whether Ford engaged in a deceptive trade practice, as defined by Colo. Rev. Stat. §6-1-105(1)(u), by failing to disclose material information concerning the roof strength, or lack thereof, of the 1995 Explorer in case of a rollover accident.

B. Third Element: Challenged Practice Significantly Impacts the Public

Ford asserts summary judgment should also be entered against the Warners' CCPA claim because they cannot prove that Ford's allegedly deceptive trade practice significantly impacts the public as actual or potential consumers of Ford's goods. *See Rhino Linings United States v. Rocky Mt. Rhino Lining*, 62 P.3d at 146-147 (citing elements of private CCPA claim).

The CCPA is intended to redress wrongs that "significantly impact[] the public as actual or potential consumers of the defendant's goods, services, or property." *Hall*, 969 P.2d at 234. The Colorado Supreme Court has identified three factors to be considered in determining

whether a practice has a sufficient public impact to support a private claim under the CCPA:
"(1) the number of consumers directly affected by the challenged practice, (2) the relative
sophistication and bargaining power of the consumers affected by the challenged practice, and
(3) evidence that the challenged practice has previously impacted other consumers or has the
significant potential to do so in the future." *Rhino Linings*, 62 P.3d at 149 (quoting *Martinez v.
Lewis*, 969 P.2d 213, 222 (Colo. 1998)).

In *Rhino Linings*, the Colorado Supreme Court held that a private contractual breach
affecting only three individuals did not have a sufficient public impact to violate the CCPA. *Id.*
at 150. There the plaintiff claimed the defendant had violated the CCPA by falsely representing
to a third party that he could sell defendant's products in Adams County, despite the plaintiff's
exclusive contract with the defendant to sell his products in that area. *Id.* at 145. The plaintiff
presented evidence that the defendant had failed to honor two other dealers' exclusivity
contracts. *Id.* The court found that this practice did not have a significant public impact
because: the dispute only affected three dealers "out of approximately 550 worldwide" who sold
defendant's products; the plaintiff was represented by counsel in his negotiations with the
defendant and "was relatively sophisticated in his education and knowledge of the business;" and
the alleged misrepresentations were disseminated privately and had no impact on the public or
consumers generally. *Id.* The alleged deceptive practice was, therefore, private in nature and
was not actionable under the CCPA. *Id.*

Similarly, in *Alpine Bank v. Hubbell*, 506 F. Supp. 2d 388 (D. Colo. 2007), this court
held that defendants counter-claiming under the CCPA did not show significant public impact
because they did not demonstrate how many consumers were affected by the plaintiff's alleged
misrepresentations. *Id.* at 410. The plaintiff was a banking corporation whose officer had

allegedly told the defendants that she would inspect their property regularly and "be on top of the project," both of which she allegedly failed to do. *Id.* Although the officer testified that her conversation with the defendants was typical of her usual conversation with potential clients, the court held that absent a showing either that other loan officers at the bank engaged in the alleged practice or evidence of the "number of consumers to whom [the officer] had the potential to spread the misinformation," the defendants had not demonstrated the necessary public impact from this practice. *Id.*

In contrast, in *Hall v. Walter*, the Colorado Supreme Court found a deceptive trade practice had a significant public impact because the defendant had directed false statements "to the market generally, taking the form of widespread advertisement." 969 P.2d at 235. The defendants in *Hall* advertised the sale of lots in a subdivision, and told potential purchasers they could access their land via a road over the plaintiffs' property, though "no easement or other license existed to permit the use of [plaintiffs'] road." *Id.* at 227-28. This deceptive public advertisement was held sufficient to meet the public impact requirement of the CCPA. *Id.* at 235.

The Warners failed to provide any materials directly addressing the three public impact factors identified by the Colorado Supreme Court in *Rhino Linings*. They provide no affidavits demonstrating how many consumers purchased defective Ford vehicles, how sophisticated the average SUV buyer is, or whether Ford's alleged nondisclosure has previously impacted other consumers or has significant potential to do so in the future. *See id.* (citing factors).[3] Instead,

---

[3] The only evidence the Warners identify in support of Ford's alleged nondisclosure having a public impact is the affidavit of their automotive safety expert, Stephen Forrest, who opines that had Ford been more forthcoming about its internal roof safety research, the Federal government would have issued a stronger roof strength standard. Ford objects to

the Warners assert in response to Ford's motion simply that "Ford has designed and manufactured countless vehicles," and therefore "Ford's conduct has significantly impacted the public." Pls.' Resp. (Doc. #51) at 17.

The Warners appear to be in a position similar to that of the defendants in *Alpine Bank*, and summary judgment could be granted solely because of their failure to provide any specific facts demonstrating a public impact. *See* 506 F. Supp. 2d at 410. The facts presented by the Warners, however, are distinguishable from those in *Alpine Bank*, as the deceptive trade practice they allege Ford committed is more obviously a matter of public concern. *See id.* The Warners have presented evidence that Ford withheld material information concerning the safety of the Ford Explorer from the public for years. Although they have not provided affidavits showing it directly, there is no doubt that more individuals have purchased Ford vehicles over the years who may have been affected by this practice than the customers of one loan officer in *Alpine Bank* or the three dealers in *Rhino Linings*. *See id.*; *see Rhino Linings*, 62 P.3d at 150.

Further, the individuals who purchased the Ford Explorer were likely relatively unsophisticated consumers with little bargaining power, as car buyers are rarely, if ever, able to negotiate the safety features of the vehicles they purchase. They are certainly less sophisticated than the businessman in *Rhino Linings*, who was represented by counsel. *See* 62 P.3d at 150. Finally, while the Warners unfortunately provide no evidence indicating the number of individuals injured in Ford vehicles because of roof collapse, this sort of vehicle defect has

---

Forrest's opinion as pure speculation regarding a matter of which he has no personal knowledge nor upon which he was offered as an expert. This objection aside, Forrest's assertions do not provide direct evidence addressing any of the three public impact factors set forth in *Rhino Linings*.

significant potential to affect consumers in the future given the Warners' evidence of the risk of roof crush in rollover accidents, especially rollovers involving SUVs. The evidence presented by the Warners therefore establishes a genuine issue of fact that Ford's alleged nondisclosure was not "private in nature," despite their failure to present specific evidence addressing the three factors set out by the Colorado Supreme Court. *See Rhino Linings*, 62 P.3d at 144.

        C.        Fifth Element: Challenged Practice Caused the Warners' Injury

        Finally, Ford argues summary judgment should be entered against the Warners' CCPA claim on the separate ground that they cannot prove that Ford's alleged failure to disclose caused their injuries.

        The Colorado Supreme Court has held that, in determining the final element of a CCPA claim, "[t]he existence of a causal link between a defendant's conduct and a plaintiff's injury is a question of fact." *Hall*, 969 P.2d at 237 (citation omitted). The *Hall* court considered the sufficiency of the causal nexus between the defendant's misrepresentations to potential purchasers of land and the plaintiffs' injuries, though defendants had not directed their misrepresentations to the plaintiffs themselves. *Id.* at 236. The plaintiffs were landowners who suffered property damage when the defendants sold lots neighboring the plaintiffs' land with the promise that residents could use the plaintiffs' road to access their new land. *Id.* The defendants' misrepresentation to their customers caused those customers to tear down the plaintiffs' fences, cut their locks and leave their gates open, resulting in the plaintiffs' loss of property value. *Id.* The court held that despite the intervening acts of the other landowners and the fact that the plaintiffs themselves were not the target of defendants' misrepresentations, there was nonetheless "a causal link between [the defendants'] deceptive trade practices and the injury to [the plaintiffs'] property" sufficient for the plaintiffs' CCPA claim to survive. *Id.* at 238.

In *Crowe v. Tull*, the Colorado Supreme Court considered the plaintiff's claim that a law firm's deceptive advertising had led him to retain the firm's services, which led to a settlement below the value of his claim. *Crowe*, 126 P.3d at 200. The law firm argued that the causal link between the plaintiff's low settlement and the firm's advertising was insufficient because the plaintiff's injury was not caused by the advertising itself, but by his lawyer's poor advice. *Id.* at 210. The court rejected this argument and accepted the plaintiff's theory that "reliance on the advertising was the first link in a chain that led to the undervalued settlement," and therefore that "the proposed chain [was] not too attenuated to submit to a factfinder." *Id.* The court therefore allowed the plaintiff's CCPA claim to be argued at trial. *Id.*

In this case, the Warners present two bases for causation linking Ford's alleged deceptive trade practice and Mr. Warner's injury. First, the Warners argue that had Ford not made misrepresentations to and failed to disclose information about its internal research to the NHTSA, the federal standards for the roof strength of SUVs would have been higher and the 1995 Ford Explorer driven by Mr. Warner would have had a stronger roof that would not have collapsed during his accident. Second, the Warners argue that if Ford had disclosed the roof protection defects of the 1995 Explorer, Mr. Warner would have never have purchased the Explorer.

The first asserted causal basis is insufficient both because it requires the court to treat Ford's alleged deception of the NHTSA as a deceptive trade practice actionable in itself under the CCPA – which, as discussed above, it is not – and because it is too attenuated to provide a sufficient causal nexus. For this conduct to have caused Mr. Warner's injury, a jury must believe that had Ford been forthcoming with the NHTSA, this independent federal agency would have set higher standards for roof strength. Although the Warners present the affidavit of

automotive safety expert Forrest asserting that the NHTSA would have reacted in this manner, Mr. Forrest does not present himself as an expert on setting federal industry standards or the NHTSA.  Thus, while the Warners plausibly argue that had the NHTSA set roof strength standards higher, Ford would have complied with these standards, and an alternative, stronger roof system might have prevented Mr. Warner's injuries, they still lack evidence to demonstrate the first link in this chain – namely that had Ford disclosed its internal testing and been completely honest with the NHTSA, the federal industry standard for SUVs would have been different.  This is pure speculation.

The Warners' second asserted basis for causation, however, is legally sufficient for their CCPA claim to survive Ford's motion for summary judgment.  The causal chain that links Ford's nondisclosure to Mr. Warner's purchase is still somewhat attenuated because Mr. Warner bought the car used from a third party, and did so years after Ford had ceased advertising that particular model of vehicle.  Nonetheless, the Colorado Supreme Court's holding in *Hall* suggests that there need not be a transaction between the defendant and the plaintiff in order for the plaintiff to show causation under the CCPA.  *See Hall*, 969 P.2d at 237.  The Warners need only present sufficient evidence that Ford's deception caused their injuries.  *See id.*

Unlike the plaintiff in *Crowe*, who relied on the defendant's advertising in retaining the defendant's services, *see* 126 P.3d at 210, Ford argues that its conduct cannot have caused Mr. Warner to purchase the Explorer because he did not rely on any advertising or representations from Ford in doing so.  The present case is distinguishable from *Crowe*, however, because the actionable deceptive trade practice is a failure to disclose, not a misrepresentation, meaning there was no particular statement on which Mr. Warner could rely.  Rather, the Warners argue that Mr. Warner would not have purchased the Explorer if he had

known it had a major safety defect, regardless of from whom he was purchasing the vehicle. While it is somewhat tenuous, this theory of causation passes muster under the law given the broad notion of causation approved by the Colorado Supreme Court in *Hall*. *See* 969 P.2d at 237.

Accepting the Warners' second causal theory as legally sufficient, they have presented little evidence supporting the proposition Mr. Warner would not have bought the Explorer had he known of its defect. They have provided no direct statement from Mr. Warner asserting he never would have purchased the Explorer had he had known its roof was not strong enough to protect him in a rollover accident, nor do they provide any affidavits or depositions from others indicating this. Rather the Warners indicate only that they "will" in the future present such evidence. Pls.' Resp. (Doc. #51) at 18. Ford points out that Mr. Warner did not seek out a car with any particular safety features, and did not bother to inquire about the Explorer's safety features when he bought it. Mr. Warner did testify, however, that he was looking to buy a vehicle that was generally safe. A reasonable jury could infer from his general requirement that the vehicle be "safe" that he would not have purchased the Explorer if he had known it had a major safety issue. This inference justifies a finding of a genuine factual issue on the matter of causation such that this issue should be submitted to the finder of fact. *See Crowe*, 126 P.3d at 210.

## Conclusion

The Warners' CCPA claim presents several challenges. Nonetheless, entry of summary judgment against their CCPA claim is not warranted. The Warners' theory that Ford's material failure to disclose constitutes a deceptive trade practice under Colo. Rev. Stat. § 6-1-105(1)(u) is cognizable because the Colorado Supreme Court has repeatedly held that the CCPA should be

construed broadly.  *See Showpiece Homes*, 38 P.3d at 53.  Although the Warners have not provided affidavits or documentary evidence demonstrating the public impact of the alleged deceptive practice, the facts of the case indicate that the alleged deception is not of a private nature but affects a large number of consumers and potential consumers.  Finally, while the Warners present a somewhat attenuated chain of causation, it satisfies the loose notion of causation provided by the Colorado Supreme Court in *Hall v. Walter*.  *See* 969 P.2d at 237.

This claim may not survive further scrutiny at later stages of development, but in the present posture of the case, summary judgment is not appropriate.  Accordingly, for the reasons stated above, Defendant Ford Motor Company's Motion for Partial Summary Judgment on Plaintiffs' Third Claim for Relief (Doc. #47) is DENIED.

IT IS SO ORDERED this 30th day of September, 2008.

s/ John L. Kane_____
John L. Kane, Senior District Judge
United States District Court